Case No. 24-1366 from the Western District of Arkansas, K7 Design Group, v. Walmart. All right, Mr. Childs. May it please the Court, my name is Chip Childs, counsel for the appellant. K7 concedes that the supplier agreement set terms on which the parties agreed to do business. K7 concedes that an order, as defined in the supplier agreement, was required to obligate Sam's Club to purchase product from K7. And K7 concedes that Sam's Club could cancel any order before shipment. First, the supplier agreement required an order, as defined in the supplier agreement, to obligate Sam's Club to buy product. The supplier agreement defined order as a written or electronic purchase order. Unless agreed to otherwise in writing, purchase orders had to be electronic. So there was no such written agreement, so electronic purchase orders were required. Under the supplier agreement for electronic purchase orders, compliance with Sam's Club's electronic data interchange or EDI requirements was mandated. The emails on which K7 relies were not EDI purchase orders. They were not purchase orders at all. As a result, the emails on which K7 relies couldn't obligate Sam's Club under the supplier agreement. Let me ask you a question. You mentioned the fact that orders are defined in the supplier agreement. Are orders contracts? Orders are offers, and the supplier agreement specifically provided an exclusive method of offer and acceptance. So they're offers and not contracts. So how would the parties then determine the material terms? The offer, which contained the material terms, would be included in the order, which is the EDI purchase order, and then K7 could accept the offer by shipping conforming merchandise in accordance with the order in the supplier agreement. Couldn't material terms also be provided by other means? Other writings? Not in this case, Your Honor, where the supplier agreement specifically requires an order, that is an electronic purchase order through the EDI system, in order to obligate Sam's Club. I guess part of my point is that if they're not contracts, then clearly they're contemplating perhaps something else to make it a completed contract. Well, if there were a purchase order, it would contemplate an acceptance, right, in order to show manifestation of the supplier's intent to contract. And I think that the K7 concedes, of course, that parties can contract that the UCC default rules don't apply, and that's exactly what they did in the supplier agreement. So the sort of very open-ended methodology for offer and acceptance provided under the UCC wouldn't apply here, where the parties specifically agreed in the supplier agreement how offer and acceptance would work. Did every completed transaction – this is actually, I think, an important point – was there a purchase order for every completed transaction, or were some of them actually completed through some of the email correspondence? It's really a factual question. The answer is that every consummated transaction was done through the EDI system. Literally each and every one, and there were hundreds of them, to the tune of $41 million worth of transactions. Each and every one done through EDI. And it's no surprise, then, in the record, that Zach Kaplan is repeatedly asking Sam's Club for purchase orders, because he knows those are required in order to consummate a transaction. In addition to the requirement of an order, K7 concedes that Sam's Club wasn't obligated to buy merchandise until shipment occurred. And K7 concedes that the supplier agreement contemplates that shipment means shipment from Sam's Club to – I'm sorry, from K7 to Sam's Club. And that is no doubt correct, because the paragraph in which the Cancel Before Shipment Clause appears talks only about shipment of product from K7 to Sam's Club. Specifically, K7 may ship only after receipt of an order. And K7 may accept an order by shipping conforming merchandise. The merchandise at issue was not shipped from K7 to Sam's Club, so Sam's Club had no obligation to purchase it. What is the supplier agreement exactly? And I wonder whether it's actually a contract. It's not a contract for the sale of goods. It's a contract or an agreement to guide the parties' further transactions, almost. And so you wonder whether there's consideration for it. What's your view of what it is? Is it a contract, is it a contract for sale of goods? What is it? I think it is a contract, and I think it also sets terms on which these parties agree they'll do business. It's not nothing. Certainly, Michael Kaplan called it a ticket to the park. So everyone knows that in order to do any business with Sam's Club, you have to enter into this agreement. And it's worth mentioning at Appendix 179, the parties negotiated payment terms before the supplier agreement was accepted. So the supplier agreement, when it's entered into K7, the supplier gets a vendor number, has the ability, should Sam's Club choose to issue orders to do business with Sam's Club, and they agree on the front end that these are the rules of the road that are going to apply to our relationship. These are sophisticated business actors, including K7, which for decades had done business with big box retailers and entered into other similar supplier agreements. K7's argument on appeal is that the jury was permitted to interpret the supplier agreement and that its interpretation is entitled to deference. But the district court concluded that the supplier agreement is not ambiguous and precluded Sam's Club from introducing any evidence about the meaning of the terms in the supplier agreement. Courts, not juries, interpret contracts unless deciding disputed extrinsic facts is necessary to resolve an ambiguity, which is not the case here. And so K7's entire theory on appeal is wrong as a matter of law, and this court should reverse the judgment of the district court and dismiss this case. Suppose, I'm just wondering, and this is missing here, but I wondered about this hypothetical. Suppose you have all the same facts except K7 says, well, we're going to great lengths. We've got to ship it to China. We've got to store all this. This is going to cost us a lot of money. So are you willing, Sam's Club, to waive the provision in the agreement about being able to cancel? Could the contract be modified expressly through e-mail or not, in your view? The supplier agreement requires that it can be modified only by a writing signed by both parties, and I suppose hypothetically an e-mail could constitute such a writing. It's important to recognize here, of course, that the authority of the buyer, that is Ms. Serber, is circumscribed by the supplier agreement. In other words, she has the authority to order only through a purchase order issued through EDI. And so K7 knows that. They know that in the beginning. And so you don't even get to shipment unless you conclude that the e-mails are somehow orders, which they're not. But on that issue of modification, K7 is even arguing modification on appeal. The district court expressly, at transcript 1494, refused to instruct the jury on modification. But even if it were an issue, in this case, which it's not, Arkansas law would require a clearly expressed intent to modify and a clear and objectively manifested indication of what the modification was. And we don't have anything like that in this case. So K7 also argues that if the contract judgment is reversed, as it should be, there's still this claim of promissory estoppel that has to be decided. But that's wrong for two reasons. The jury found that the parties had a contract, and K7 concedes that the supplier agreement applies. The supplier agreement applied to all merchandise defined to include all goods and products sold by K7 to Sam's Club. And it set an exclusive set of procedures for offer and acceptance, which we've discussed today. It leaves no room for an argument that some other type of conduct would expose Sam's Club to a claim of promissory estoppel because the law will not imply a contract where one exists. Did I hear you say that the supply agreement is a contract for goods then or not? Did I mishear that? I thought you said for all goods, and Judge Strauss had asked that earlier. It applies to all merchandise, which is defined as all goods to be sold by K7 to Sam's Club. So it's not a standalone contract to sell goods. I would agree that other terms needed to be applied if you want to look at it like a contract for the sale of goods under the UCC. But it is a contract that sets forth how these parties are going to do business together. And so it is a contract that specifically talks about means of offer and acceptance that you could not somehow deviate from through promissory estoppel because there is an agreement that covers that specific subject matter and removes this from the realm of somehow needing to provide an equitable remedy. On the issue of promissory estoppel, in the absence of a written contract, this may be your number two, but I may be getting to it early, which is this is kind of a prototypical case that you learn in law school for promissory estoppel. In the absence of a written agreement where one party says, you know, if we do this, this is going to be like a huge lift. We've got to get this warehouse situation. We've got to get all this stuff from China. You know, it could be a business-altering move. And Sam's Club sort of says confirmed in one of those emails or the buyer. And they do all of this, and then they're left holding the bag. And so how much of it depends on the fact that there's a written agreement here that governs their negotiations? You're right, Your Honor. That's the first point. There is a written document that says how all this is going to work. But it also sets out these specific requirements for how we're going to do business, and it says no other representations about quantities to be purchased will be binding on Sam's Club. And so the idea that in the face of that agreement that this sophisticated business actor, K7, entered into, there's no way they can come in and say then we reasonably relied on other representations about quantities to be purchased when we've specifically told you on the front end we're not doing that, we're projecting, we're forecasting, which is exactly what Zach Kaplan talked about in March of 2020, what Jessica Serber talked about in April of 2020 in the emails, projections, and forecasts. So that's, I think, the context in which you have to look at these emails talking about commitments. But two reasons there can't be promissory estoppel, the second of which K7 doesn't even address at all in its brief. Going back a little bit, what is the language in the supply agreement that says that orders have to be through the electronic system? I may be not using the right term, but what specific language is that in the supplier agreement? Right, so it's in Section 2, and it says orders will be electronic unless otherwise agreed in writing, no such agreement in writing, so electronic purchase orders are required. And then it says suppliers shall comply with SAMS Club's electronic transmission requirements and references EDI requirements, which is the SAMS Club electronic data interchange, which is how each and every purchase order that was issued in this case was transmitted. And the very reason that Zach Kaplan is repeatedly saying we need purchase orders, we need purchase orders, is because they know the emails are not purchase orders as required to obligate SAMS Club. The judgment of the district court should be reversed, and this case should be dismissed. Unless there are other questions, I'll reserve the rest of my time. Thank you. Mr. Newman. May it please the Court, David Newman on behalf of K7. Mr. Childs says that K7 makes all these concessions. I would disagree with that. But I want to speak to the questions that the Court asked of Mr. Childs. The settlement agreement is not a contract for the sale of goods. This Court ruled, and Mr. Childs doesn't really address it, in the Grandot case, that 761 F3rd 876. And I want to read a few quotes from it. It does not appear that the parties intended the RAC, that was the supplier agreement in that case, to be the final expression of their agreement. Rather, the RAC explicitly contemplates a future contract for the sale of gloves. It continues on. But the subject matter of the RAC does not include the actual sale or purchase of gloves. If that were the case, then no gloves would ever have been exchanged since the RAC does not include a quantity term. Similarly, Judge Brooks, who was the Article III judge in this case before he decided to go before Judge Comstock, wrote in a case called London Luxury against Walmart, the same client that Mr. Childs represents. In that case, the jury awarded $100 million to the plaintiff. But in dealing with the supplier agreement, Judge Brooks wrote, the supplier agreements may define the rules, the rules for how the game will be played. But until the game actually begins, the rules are of no moment because no one has yet stepped to the plate, much less throw a first pitch. Therefore, the court finds the supplier agreements viewed in isolation from the other operative terms were unenforceable agreements to agree that imposed no legal obligation on either party. Judge Cobes, I think you asked what was the provision that says it can't be in writing. Mr. Childs misstated the definition in the supplier agreement. And just let me provide the court with that definition, if I can quickly find it. It says here, and this is in the addendum page 19, it says order, not purchase order, but order, means any written or electronic purchase order for merchandise issued by the company through an authorized buyer. It doesn't say it has to be electronic unless decided. To the contrary, it could be a writing. So when it says a written purchase order, it's hard to suggest that emails can't be a written purchase order. I mean, the Arkansas signature law, electronic signature law, says that an email should be considered as if it's a contract even though it's not specific. Were there any, I mean, there was a discussion about all the orders that were submitted were submitted through the electronic system, and that's why your client kept asking for that, because it reflected their understanding that the supplier agreement required use of this. That's not correct, Your Honor. The orders were through the emails. Then the production of goods. Then when the goods were ready to be shipped, after everything took place, a purchase order is issued so that K7 knows where to send those goods. The purchase order says it goes to Walmart Distribution Center A or B or C. That comes at the way end of the transaction, after the goods are manufactured, after the goods are shipped. If that was the contract, then you wouldn't know what to do because the goods are already done. The reason the goods are manufactured, the reason the goods are shipped, is because you have the email. The purchase order is not the beginning document. It is the end document in the cycle. Of course. I think Walmart would argue, based on the supply agreement, that they had the right to cancel up until the point where the purchase order was submitted. Well, what the document says, Judge Strauss, is that they have the right to cancel until shipment. And the word shipment is not defined. Now, Walmart drafted the agreement. They defined order. They didn't define shipment. So the question then becomes, is it shipment from China to the warehouses in the United States, or from the warehouse in the United States to the distribution center? That's a question of fact, and that's why Judge Comstock put that to the jury. Similarly, with what was the contract for the sale of goods, you have a supply agreement to which the parties are bound for sort of overall terms, and then you have the specific orders, which are the emails. Again, I think as a matter of law, Judge Comstock could have ruled that the emails were the contract for the sale of goods, but she decided to the contrary, and that was the first jury instruction. And with regard to the emails, I'm sure your honors have seen the emails, but there is a email chain in each situation. It provides the quantity. It provides the identification of the goods. It provides the price. It provides the delivery terms. Then at the end of each of those change, you have things like the buyer at Walmart saying, we will take what we can get. Do not want quantities to hold us back. We will take all the pallets on schedule below ASAP. I am aligned. Confirmed, we'll take all the units on the chart. Let's move forward. Shorter lead time, the better. Next, I'm aligned so long as move up availability. Those are all in the emails. The purchase order isn't even being thought about at this point. This is pre-manufacturing. Once Walmart says, confirmed, we'll take it all, I want all the pallets, then K7 goes and manufactures. The goods then go from China to the warehouse. When they're in the warehouse, then Walmart says, I want it to go to each of these distribution centers. The purchase order, again, comes at the end of the situation. The problem I'm having with your argument, and it comes down to this for me, which is in those emails, and that's why I asked this question of opposing counsel, had K7 said, well, this is a big deal. This is a business-altering decision for us to do this for you. Will you waive your right to counsel the orders that's in the supply agreement? I think you'd have a slam-dunk win, or at least it should have gone to the jury. I think it's harder when none of the emails you reference talk about the cancellation right, at which point then you kind of look back on the one written agreement between the parties, which gives the right to counsel. Now, we can have a debate about the shipment when the shipment happens, but that's the problem I'm having with your argument, I think. Well, but I think the cancellation is when there is a shipment. I don't think it's when the purchase orders are issued, Your Honor. I think it's cancellation when there is shipment or before shipment. So the word shipment is really the key word here. There's no definition, so it leaves the jury to have to decide when that shipment is. Is it when the goods go from China to the United States? And that's key because that's the point when the goods are manufactured. Was the jury instructed to answer that question? Not specifically, Your Honor, but Walmart had the opportunity to make those arguments, just like it did with regard to whether the emails constitute an order. So those issues went to the jury. They were not decided by the court as a matter of law. If I were to say as a matter of law, hypothetically here, that shipment was when it left K7's possession and was shipped to a Walmart distribution center, in other words, if we were to disagree with your interpretation of shipment, can you still win on another theory as far as cancellation goes? I mean, is there any argument you have like that this was an amendment, that these emails were amending it? Well, the supplier agreement specifically says that it can be amended or revised by any writing signed by the parties. Clearly, the emails are documents signed by the parties. So when Walmart says, I want it, give it to me, give it to me, send it to me, I want all the pallets, regardless of what the supplier agreement says, of course it doesn't have essential terms, that's the contract of the parties. So when Walmart says, deliver it to us, give it to us, it seems to me to the extent Your Honor is suggesting that the supplier agreement can be amended, that could be considered an amendment. Walmart says, send it to me, give it to me now. I don't think that they can now go back to the supplier agreement and say, well, you know, we can cancel before shipment. You told us to ship the goods. And remember, Your Honor, this was in 2020 during COVID. So that's why everything was moving so quickly. That's why Walmart is saying, I want it now. I want ASAP. This wasn't the usual situation where, you know, there wasn't the issues of COVID. So when Walmart said, do it, do it quickly, I want it now because we need to fill our shelves, because we want to make sure our customers are taken care of, that's exactly what K7 did. In accordance with the agreement, there is no contention here that the goods were not delivered timely, that there was something wrong with the goods, anything else. The end line here is that when COVID started to decrease a little bit in 2020, or the government came out and said that COVID can't be caught as much by touching, the demand for hand sanitizer went down. So in March and April, when Walmart was saying, give it to me, I want as many pallets as you can give me, we went, K7 went, and manufactured. Then in, say, the July-August period, where the demand for hand sanitizer went down slightly, all of a sudden Walmart found itself with millions, millions of bottles of hand sanitizer that it couldn't take. That's not our problem. That's not our problem. Walmart said, deliver, I want it. You can't come back and say, well, it was a projection. You didn't tell us, well, I'm thinking about it. You said, I want every pallet. I want every one on the chart. That's pretty clear language. We're talking about Walmart, one of the biggest, if not the largest, retailer in the United States. They made their own decisions as to how much they wanted. They didn't come to K7 and say, what do you think about the market? How much do you think we ought to order? Walmart wanted to make sure it had a complete supply of hand sanitizer. We supplied that hand sanitizer. The emails are clear. The supplier agreement, again, is sort of an overall agreement. As Judge Brooks said, it sort of sets the rules of the game, but the game doesn't start until someone comes to home plate. I wonder, just on that point, I wonder whether or suspect that what maybe happened is it's one of your classic business misunderstandings, maybe even a mutual mistake, although it's been a while since I've thought about what mutual mistake means in the contract context. I think Sam's Club said, I got the right to cancel. No risk here. Let's have K7 bulk up their supply of hand sanitizer. I can always change my mind. I think K7 read these emails as, we want it. I guess they're waiving the right to cancel, and we can go from there, and this is enough to form a separate contract. What does Arkansas, I know what Minnesota contract law says about that. What does Arkansas contract law say in a situation like that? I know it wasn't really argued that way, but I'm trying to fit this case in a box. Well, the only thing that was argued with regard to Arkansas law was the Arkansas electronic signature act, which we talked about in terms of the emails constituting a contract, and then the UCC, the Arkansas UCC. Walmart doesn't believe that the UCC is applicable. We do because the supplier agreement does not provide all the terms and conditions, so you have to look to the UCC to determine what constitutes a contract. So those are the only issues that came up with regard to specific Arkansas law, Your Honor. Okay. What about promissory estoppel? You might have gotten there eventually, but I'm very curious about the existence of the agreement and reasonable reliance. Yeah, I think Your Honor raised a good point. Promissory estoppel was dismissed at the end because the jury found that there was a contract. If there's no contract, then, I mean, and I guess because Walmart is saying the supplier agreement is a contract, but it's not a contract because it doesn't have the terms. If Walmart is arguing that the emails are not the contract, well, then it seems to me you don't have a contract. So if you don't have a contract, the alternative theory is promissory estoppel, and clearly you can make a case that based upon all the emails where Walmart says, please deliver, hurry up and deliver, that K7 relied on that. I don't think there would be any argument that K7 didn't rely on that because it spent millions of dollars to go to China and manufacture these goods and also incurred all kinds of other costs, shipping and warehousing and storage. So I think the promissory estoppel argument would still be alive if the contract theory was not. Your Honors, unless there are other questions, I'll rest here, and we ask the Court to affirm the decision below. Thank you so much. Thank you very much. Mr. Charles. I want to pick up with a question that ties into what Judge Strauss was suggesting. The supplier agreement states that it provides the complete allocation of risk between these two sophisticated parties. If K7 refused to source product in the absence of a purchase order as required by the supplier agreement, then Sam's Club takes the risk that it won't have the product to put on its shelves. If K7 decides, however, to go ahead and source the product without a purchase order from Sam's Club as required to obligate Sam's Club, then K7 takes the risk that Sam's Club won't order the product. That is the deal these sophisticated parties struck at the beginning of their business relationship, and it is the lens through which this has to be viewed. Mr. Newman referred to Judge Brooks' order in the Lunge and Luxury case, and he quoted, I think, this language that the supplier agreement sets the rules for how the game will be played. That is our point exactly, and sophisticated business actors must be able to agree on the front end to the rules for how the games will be played. Mr. Newman also said that a purchase order is issued so K7 then knows where to send the goods. A purchase order, exactly what the supplier agreement defines an order to be. A purchase order, here an electronic purchase order issued through EDI. None issued for the goods that are at issue here. Therefore, Sam's Club could not be obligated. Shipment, contrary to my colleague's argument, is not a question of fact in its meaning. Courts, not juries, interpret contracts. Absent ambiguities whose resolution depends on deciding disputed extrinsic facts, which is not the case here. Under the four corners of the supplier agreement, this court can conclude as a matter of law that shipment means shipment from K7 to Sam's Club. And even if the court were going to look beyond the four corners, we repeatedly in the transcript and in the emails have Zach Kaplan saying, I need the purchase order so I can ship the product to Sam's Club. I think your time has concluded. Thank you. The court should reverse the judgment of the district court and dismiss this case. Thank you very much. The case is submitted. The court will take the matter under advisement and issue an opinion in due course.